Mr. Ortiz-Bravo presented three issues on appeal. With the Court's permission, I'd like to proceed directly to the second issue, which is whether or not the District Court properly failed to instruct the jury as to the voluntariness element of the appeal. for a found-in 1326 charge. Mr. Ortiz-Bravo argues that his conviction must, in fact, be reversed because the District Court did err in failing to instruct on the voluntary act element despite evidence presented at trial that Mr. Ortiz-Bravo's entry into the United States was not willful and voluntary. Well, if you look at Quintana Torres, there's a presumption that his entry was voluntary, and you've got to present enough evidence to justify the giving of an involuntariness instruction. And here, there's nothing even similar to being hijacked or extradited or being flown by an airplane while asleep. I mean, you concede that he walked into the United States. That's correct, Your Honor, but the circumstances under which he walked into the United States are what bring up the voluntary and knowing element. You say he was under the influence of heroin. That's correct, Your Honor, and was lost as a consequence thereof. Well, but he voluntarily walked into the United States. Well, that's the question, is whether or not he could. He was voluntarily where they found him. Not necessarily, because he didn't know where he was. If he were lost or hijacked or in any of the other circumstances that the Court has raised in other cases in the United States, then certainly there wouldn't be the mens rea necessary to commit the crime. If he didn't know that he had come into the United States and was lost, then certainly he wouldn't have committed a culpable offense because he wouldn't have had the culpable mens rea. But voluntary intoxication does not constitute a defense to lack of mens rea, does it? No, Your Honor. We're not contending that this is a specific intent crime. Rather, we're contending that when there is a showing of lack of willfulness or lack of voluntariness, according to Yarbrough, even if it's weak, insufficient, inconsistent, or of doubtful credibility, that the defendant would be entitled to a voluntariness instruction that the jury then could determine whether or not there was sufficient evidence that Mr. Ortiz-Bravo had, in fact, been lost or confused. What was the evidence that he was so far, or that, first of all, that he was under the influence of heroin, and secondly, that he was so far under the influence of heroin that his actions were involuntary, as you described them to us? In other words, he was incapable of knowing what he was doing or where he was. What was the evidence on that? Is it just he said he'd used heroin that morning? No, Your Honor. What else was it? First, Your Honor, when he approached Agent Garcia, Agent Garcia, the Border Patrol agent who was there at the scene, noticed that he seemed confused or lost. Those were her words, and I believe that's at the excerpt of record at page 27. She wondered then, based on her experience in professional training, whether or not he might, in fact, be confused or lost or under the influence of some mind-altering substance. So the evidence was that she wondered? She wondered, and she did ask him then. Did she perform any tests? She did not perform any tests. She asked him if he was under the influence. Any blood tests or anything like that? Any tests at all to discover the extent, if any, of his heroin intoxication? That's an interesting question, Your Honor, because she What's the answer? Well, the answer is somewhat complicated. He was taken upon the termination of her supervisor to a detoxification facility before being taken to the MCC. After being released from detox, it was determined that he was under the influence of heroin. By who? By the people at the detoxification. Was that put in evidence? We tried to, Your Honor, and Judge Moskowitz said that, absent of showing that he didn't know, I think Judge Moskowitz's words were, up from down, that he wasn't going to allow any of this evidence in, there was a custodian of records sitting in the hall from the detoxification facility that wasn't allowed. So Judge Moskowitz ruled you hadn't crossed the threshold to be able to get into the issue at all? Correct. He ruled that there was not any sufficient indicia that he was lost or confused. Did your client testify on that score? He did not, Your Honor. He did not. We relied on the testimony presented by Agent Garcia and the other agents who were present at the scene. To what extent was he nonresponsive to any questions? He was somewhat responsive, but as noted, he seemed lost or confused. He didn't have with him any identification. He didn't have a backpack. He didn't have any extra clothing, any contact information, any maps, any food, any water, anything to indicate that he was planning on taking a trip through what Agent Garcia described as very rocky and hazardous terrain. What was he doing then? Wandering, Your Honor. How far from civilization on the other side of the border?  Is this a hobby of his, he wanders? I wouldn't know what his hobbies are, Your Honor. There are farmhouses and whatnot in the area on the other side of the border. Notably, unlike other cases that different panels of this Court has heard, there wasn't a fence or anything he had to climb over to enter into the United States. There were no pylons indicating that you are now entering the United States. So he was going through very rocky and mountainous terrain and came upon someone and actually approached the Border Patrol agent asking who knows why he approached, and then she asked him questions and gave him water. It was later then determined that he was under the influence of heroin, and it turned out that Agent Garcia's interpretations that he was lost or confused were in fact true. So that when the defense did present either according to previous law, parguerosis, the government sites absent a showing, here we have a showing that there was a lack of willful or voluntary entry. Here's the agent's testimony. At any time did Mr. Ortiz indicate where he had come across the border? Yes, he did. He pointed south towards O'Neill Valley, my area of operation, towards the O'Neill Valley, yes. And was that when he made the statement that he'd crossed earlier that day? That's correct. So he evinced an awareness of crossing the border, did he not? I don't know that he evinced an awareness of crossing the border. Agent Garcia. Well, if he said he crossed the border earlier that day and he pointed where? He pointed to the direction from which he had come. And the agent said he crossed the border. Did he deny saying that? She said that he had crossed the border. Did he deny telling her that? It didn't come out at trial. So then that's the evidence that the judge is left with. He told the agent he crossed the border earlier that day. I don't think that those were the statements he made. Well, I'm reading the testimony. I don't know what she said. And was that when he made the statement he crossed earlier that day? That's correct. Did Mr. Ortiz indicate where he had come across the border? Yes, he pointed south towards the O'Neill Valley, yes. And was that when he made the statement that he crossed earlier that day? That's correct. I mean, what do you do with that? His statement, uncontradicted, is I crossed the border earlier that day. And his statement, if we refer to the excerpt of record at page 27, Agent Garcia said that his responses, and I think those are the responses that the Court's referring to, were slow. I don't know if he was confused or lost. Well, what if he crossed the border voluntarily and then took heroin between the time he crossed the border and saw Agent Garcia? He still was voluntarily in the United States, was he not? I think that would be a very different question, Your Honor. Is there some evidence that he took heroin before he crossed the border? I think his statements were that he had taken heroin earlier in the day before he had later found out that he was in the United States. I don't want to beat a dead horse, but I don't see how you can claim there's sufficient evidence to get an instruction when your own client, uncontroverted, says I crossed the border earlier that day. I mean, I have a question, and I'm just telling you that's the record. I think that when he's sitting with a Border Patrol agent, Your Honor, with all due respect, at that point in time, he's figured out probably that he's in the United States. When he's sitting there with a marked Border Patrol agent vehicle. He's not so gone that he's now figured it out? He figured it out at some point, at which point we don't know. I get your argument. I just don't see the foundation for it in the record. The foundation on the record is when he crossed into the United States, there was not a line of demarcation. So there must be a voluntary act of him crossing into the United States. When he then contacted Agent Garcia, he may well have known that he had crossed into the United States. You know, if he'd have said, he'd have said, where the hell am I? Am I in the United States? I mean, well, even then, with the question of credibility, it would be a lot different than when the agent says, where did you cross the border? He says, I crossed the border over there. Certainly. And at that point in time, when he's talking to a uniformed United States Border Patrol agent in a marked Border Patrol vehicle, he's figured out he's in the United States, unquestionably. I think the question occurs somewhat temporally earlier than that, as to whether or not he knew that he had crossed into the United States before he encountered Agent Garcia. There was evidence that he was confused or lost based on her own observations, which entitled him to an instruction. In the half minute or so that you've got left, assuming we affirm the conviction, what kind of remand does your client get? Well, we think that his conviction should be reversed, but assuming that it's not, we would ask for a full remand so that the entirety of the issue is constitutionally preserved here. What ground do you get a full remand as compared to an amyling remand? Because we think we presented constitutional issues regarding the instruction, so that that issue could be revisited and rebriefed in addition to the amyling remand. I hear he wasn't asking for your personal view. I was really asking for what is your basis for your argument. The basis for the argument, Your Honor, is that we think we've – again, I said I think. I apologize. That we have preserved it both constitutionally. Point to language where you preserved it. How did you preserve it? And are you specifically – I'm not asking for your personal opinion as to whether you did or not. I understand. I'm asking you to point to where in the record you preserved it. And you're talking specifically about Issue 3 then and not Issue 2 now. Am I correct on that? Was that unclear? No, it was to me at first, Your Honor. Assuming we affirm the conviction, what kind of remand does your client get? Is there something unclear about that question? I misunderstood it. What's the answer? The answer, we think, is that he should get a full remand because Judge Moskowitz at the time not only did not know that the guidelines were not entirely binding on him or that they were advisory, but also that we objected to the application at that time and stated that Elmendorf was – You just stated your opinion a second time. You didn't do what I asked you to do, which is to point where in the record you think you preserved that. You've not told me a second time that you believe you preserved it. In citing to the case no and – I'm sorry? In citing to the case no, NGO, I think is how it's pronounced? I think – No. It's helpful for you to point where in the record. You know, records have page numbers and things of that sort. Correct, Your Honor. So you tell me where and point to language and tell me what it says and explain to me why you think it does what you think it does. That's – Your sentencing objections are at ER 133 to 135, just to help you out here. Thank you. Do you have ER 133 to 135? In front of me. Okay, good. So why don't you look there and talk to me about the language there. I would refer the Court to ER 134, where we acknowledge the state of the law. Okay. Do you see the left-hand side of the page? I do. Do you know what those numbers are? I do. Okay. Why don't you make reference to those numbers? Starting at the end of line 8 and going to the end of that paragraph at line 11. Okay. Knowing that this state of the law may or may not change, he wanted to object to the calculations based on the predicate findings that require more than one factual finding for criminal history points. You know, you sort of partially quoted, partially mumbled what's there. I mean, you sort of paraphrased and sort of mumbled. What is it that this says? It says that knowing that the state of the law is in flux, he objects to the calculations and the increase above the statutory maximum of two years based on the finding of criminal history points. And in your view, that's enough to preserve a full challenge? Yes, Your Honor. I don't see any reference to the Sixth Amendment, which is what normally a full challenge would require. Normally a full challenge would require a reference to the Sixth Amendment, but I think this Court has held that any time the constitutionality of the guidelines has been called into question, that that is enough to preserve a full remand. And here, although inartfully done in saying that the law is in a state of flux, our position is that that was preserved by saying that the law is in a state of flux and it was objected, the increase was objected to. So while we should have referred to the Sixth Amendment specifically. Well, what you say here, and I agree about the inarticulate part, he says he just wanted to object to the calculation based on predicate findings that require more than one factual findings. What does that mean? It means specifically that the factual findings required by and relied on by the case law that's the progeny of Almendarez-Torres is what he's objecting to. These factual findings based on a state of the law that's in flux is what he's objecting to for the increase. What does that require more than one factual findings mean? Factual findings specifically that they were not related offenses, factual findings that I know this Court has heard in briefing probably ad nauseum that the defendant was over the 18 at the time of conviction, that the conviction documents were, and in fact, what they state to be, that according to Shepard, the conviction documents were adequately proved up, the panoply of arguments that have been made, I think, by a variety of defense lawyers since then. So the key here seems to be that this Court needs to make more than one. Correct. What's magic about more than one? I mean, why does that then correlate into constitutional claim? Why isn't one enough? What does the multiplicity of findings have to do with constitutional? The multiplicity of findings simply complicates the fact that it's a constitutional issue that's being raised. Here, the district court, Judge Moskowitz, had to find that Mr. Ortiz-Bravo's claims were not related, that they all scored as they were supposed to, and that when he did that, when the state of law was in flux, and we, as the Court and I concede, inarticulately objected to it, that the constitutional issue was preserved. Okay. Thank you.  We'll hear from the government. May I please look forward, Alice, and just, Your Honor, for the United States. There were four issues. What kind of remand does the Federal get, in your view, assuming you're from the conviction? As stated in my papers, Your Honor, a limited amylene remand, just to determine What do you make of that language on page 134 of the ER? He does seem to say more than nothing, which is what we usually reward. Nothing is what we reward with an amylene remand. He actually seems to be making some sort of objection to the findings. It's my understanding that counsel made an objection based on the calculation of the criminal history points and the upward adjustment of the plus-12 enhancement under the 2L1.2 guidelines. I don't know if it reaches the level of a constitutional challenge. This Court is very well aware that the Court has to take into account the sentencing guidelines in fashioning a sentence. It's my understanding just this sentence, excerpts of Record 134, lines 8 through 11, is that he was challenging the criminal history category calculation, and that was it. Well, he's making some objection to the practical findings, which is different from challenging the calculation. He's actually saying there's something wrong with the findings. He doesn't quite say constitutional. He doesn't quite say this requires a jury or anything of that sort. He doesn't mention the Sixth Amendment. But he does seem to say something that challenges the findings. And it's obscure. I interpreted, having been at that hearing, I interpreted Mr. Carroll's comments to relate to the findings of the different felony convictions that his client had sustained, the years in which they occurred, the length of the sentences, the type, not even the type of sentence, just the date, whether they were related to one another and the length of the sentence. And those were the findings that Mr. Carroll was trying to get. Well, he does talk about the law being in flux. Yes. So he's not just making specific objections to the calculations here. He's saying the law may be changing, and I'm wanting to preserve my objection. It sounds to me like this could be a constitutional challenge, although I must say it's unlawful. Well, anyway, I think I understand your view. Go ahead. I'd like to address the second issue, which is the voluntariness instruction requested by the defense. First of all, I completely disagree with Mr. Carroll's resuscitation of the facts. It's an outsight to the excerpts of record and the supplemental excerpts of record. In this case, defense counsel made a tactical decision not to present evidence of the heroin expert, as well as the admission of the medical records, even though those two individuals were present. Judge Moskowitz did make some comments that he thought that the expert, Dr. McParlin, that counsel wanted to call, his testimony may not be relevant, but that Mr. Carroll had made a tactical decision not to call those two individuals. And that's supplemental excerpts of record, page 15. With that said, what we're left with is the agent's observations of the finding the defendant at a tourist attraction, Desert View Tower, which is north of Interstate 8, approximately 2 miles north of the border. And as Your Honors have held on numerous occasions, most recently in Bahena Karnas and Quintana Torres, that having a defendant being found somewhere other than the border can, you can infer there's sufficient evidence to show voluntariness of entry. The... But if he is under the influence, I mean, if he's sort of stumbling around and he really is under the influence, that raises an issue as to whether or not he was here voluntarily. I mean, he could have raised that influence, but at least that he did it voluntarily. But why doesn't this raise a question for the jury to decide whether or not, in fact, this was a willful crossing of the border or just a stumbling over under the influence of a bazaar or alcohol? Because those are simply not the facts in this case. In this case, we have evidence that the defendant was seen sipping some water, walking towards the Border Patrol agent, answering the questions in a responsive manner, albeit slow, pointing south when asked, when you cross the border. He had the wherewithal to figure out which direction he was in and point south. He apparently walked just under two miles during rocky and mountainous terrain, crossing an interstate highway, Interstate Highway 8, and coming into a tourist attraction, Desert View Tower, which Judge Moskowitz described as an area where a museum and informational center that the public can go to. This is not the case where he rolled in or stumbled or otherwise those other situations that Quintana Torres talked about, being paroled in or having a plane land or sleeping on a train. The evidence was that this individual was very alert. Not very alert. He was alert. He was responsive. He was answering questions. He was pointing to where he crossed. There was sufficient evidence. But there was also evidence that he wasn't under influence, right? There was testimony from the agent that one of the statements that he made was that he was under the influence, that he had used heroin sometime earlier. What about this testing that occurred afterwards? You mean at the detoxification center? Yes. That evidence was not presented to the jury at defense counsel's urging that he made a tactical decision not to present that. I included the sheet of paper. It's supplemental excerpts of record. It's page 13 in the SCR. And basically it's a sheet of paper that this individual was transported from the Border to the detoxification facility where he was cleared just a few hours that same day at 4 o'clock that afternoon and transported to the MCC for incarceration. So at the very least, he was just at the facility just to get checked out, presumably, but he was cleared just a few hours that same day to be put into general population.  Thank you. The Cajun's argument will stand some minutes. We'll next hear argument in United States v. Guadalajara Ponds. We'll have to see.
judges: Kozinski, Trott, Bea